# In the United States Court of Federal Claims

| | |
|---|---|
| TRUMBLE CONSTRUCTION, INC., | |
| *Plaintiff*, | |
| v. | Case No. 24-164 C |
| THE UNITED STATES, | |
| *Defendant*, | (Filed: May 28, 2024) |
| and | (Re-Filed: June 12, 2024) |
| PACIFIC TECH CONSTRUCTION, INC., | |
| *Defendant-Intervenor*. | |

Ian A. Cronogue, Baker, Cronogue, Tolle & Werfel, LLP, McLean, VA, for plaintiff.

Alexis M. Daniel, Civil Division, United States Department of Justice, Washington, DC, for defendant.

Aron C. Beezley, Bradley Arant Boult Cummings, LLP, Washington, DC for defendant-intervenor.

**OPINION AND ORDER**[1]
**Granting the Government's Motion for Judgment on the Administrative Record**

**SILFEN,** *Judge*.

    The U.S. Army Corps of Engineers, acting on behalf of NASA, solicited offers to replace the roof of a NASA facility. The Army Corps awarded the contract to Pacific Tech. A second offeror, Trumble, filed a bid protest seeking to enjoin the Army Corps from proceeding with the contract. Pacific Tech intervened.

    Each party moves for judgment on the administrative record. According to Trumble, the Army Corps's evaluation was arbitrary, capricious, and not in accordance with law, because the

---

[1] This opinion was originally issued under seal to give the parties an opportunity to propose redactions of protected material. The parties filed a joint proposal for redactions on June 11, 2024. ECF No. 46. The court reissues this public opinion accepting the proposed redactions.

1

Army Corps changed the terms of the solicitation from a 1000-day performance period to a 1500-day performance period and then penalized Trumble for offering to take less time, and because the Army Corps did not hold additional rounds of discussions with Trumble to correct deficiencies or a weakness in Trumble's proposal despite Trumble's lower-priced offer. The record shows that the Army Corps reasonably determined that Trumble's proposal was technically unacceptable under the terms of the solicitation; the Army Corps reasonably assessed a significant weakness to Trumble's proposal; the Army Corps reasonably changed the performance period; and the Army Corps was not obligated to continue discussions with Trumble to remedy its deficiencies and weakness. Thus, the court **grants** the government's motion for judgment on the administrative record, **grants** Pacific Tech's motion for judgment on the administrative record, and **denies** Trumble's motion for judgment on the administrative record.

## I. Background

### A. The solicitation and evaluation criteria

The government issued solicitation number W9127823R0003 to replace the roof on Building 103 of the NASA Michoud Assembly Facility in New Orleans, Louisiana. AR 144-45 (filed under seal at ECF No. 21). Building 103 is a large NASA manufacturing facility. The current roof leaks during storms because of damage from a 2021 hurricane. *Id.*; AR 7; AR 333. NASA contracted to have the Army Corps provide "planning design, project management, acquisition, construction administration, construction oversight and related services for the … repair and replacement of [the] hurricane-damaged and degraded" roof. AR 129. The Army Corps decided to replace the roof in four phases. This solicitation covers phases 3 and 4; a different contractor under a different solicitation performed the first two phases. AR 2346-47.

The Army Corps opened the solicitation to "any responsible, interested construction contractors." AR 454. The Army Corps created a source selection evaluation board to independently evaluate and provide a rating for the non-price factors of each proposal. AR 454. The solicitation explained that proposals would be evaluated in four steps:

1. an initial check to make sure the proposal is "in compliance with all administrative and submission criteria";

2. a non-price factor evaluation by the evaluation board, which provides a rating and a narrative for each factor;

3. a price evaluation, where the proposals are not rated but "analyzed for fairness and reasonableness through the use of cost and price analysis"; and

4. a non-price / price tradeoff analysis.

AR 454.

The solicitation explained that the government would award the contract to the offeror with "the proposal that offers the best value to the Government in terms of their combined factor ratings and price." AR 454. The solicitation further explained that the evaluation process "may result in an award being made to [a] higher rated, yet higher price offeror where the … [source selection

authority] reasonably determines that the superiority of the non-price factor ratings of the higher priced offeror justifies the additional costs." *Id.*

The agency would review four non-price evaluation factors, which "when combined, are significantly more important than price." AR 441. The four non-price factors are below, in order of relative importance. They required the agency to evaluate each offeror's technical approach and the experience and qualifications of the managers on the project.

| EVALUATION FACTORS AND ORDER OF RELATIVE IMPORTANCE |
|---|---|---|
| Volume | Factor - Description | Relative Importance |
| Volume I | Administrative Requirements | Not Rated |
| Volume II | Factor 1 - Past Performance Information of the Prime Contractor | 1st in relative importance; more important than Factor 2 |
| Volume II | Factor 2 - Technical Approach | 2nd in relative importance; more important than Factor 3 |
| Volume II | Factor 3 - Key Management Personnel Experience and Qualifications | 3rd in relative importance; less important than Factor 2 |
| Volume II | Factor 4 - Small Business Approach | 4th in relative importance |

AR 441.

For the technical approach (factor 2), the solicitation listed the following rating definitions, explaining that offers rated as "unacceptable" were unawardable.

| Ratings | Combined Technical/Risk Rating Definitions |
|---|---|
| OUTSTANDING | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| GOOD | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| ACCEPTABLE | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| MARGINAL | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| UNACCEPTABLE | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is unawardable. |

AR 457. Under technical approach, the solicitation required a detailed narrative including a "list of subcontractors to be used for the project," a schedule, and a materials acquisition plan. AR 443-44; AR 1786.

Under key management personnel (factor 3), offerors had to demonstrate that certain managers who would oversee the project met minimum qualifications. AR 457. Each manager's resume had to show that he or she had a specific number of years of relevant project experience. AR 444-45. That requirement applied to each of (1) the construction project manager, (2) the on-site

3

superintendent, (3) the contractor quality control manager, (4) the site safety and health officer, and (5) the registered roofing observer. *Id*. The solicitation included an example of the types of information that the board would evaluate, and that information included each manager's past projects and those projects' durations. AR 369. The agency explained that it would rate each offer as either "acceptable" or "unacceptable" under factor 3. AR 458.

According to the solicitation, the contract would only be awarded to an offeror whose proposal contained no deficiencies. AR 460. A "deficiency" was "[a] material failure of a proposal to meet a Government requirement or combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." AR 458. Thus, each manager whose experience did not meet the requirements would be counted as a separate deficiency. AR 457-58. A "weakness" was a "flaw in the proposal that increases the risk of unsuccessful contract performance." AR 459. A "significant weakness" was "a flaw that appreciably increases the risk of unsuccessful contract performance." *Id*.

The solicitation originally provided an independent government cost estimate (IGE) for the total cost of phases 3 and 4 of the roof replacement. AR 389. The IGE represents a baseline against which the Army Corps would evaluate proposals for cost. *See, e.g.*, AR 1831-32. The original period of performance was 1000 days and totaled $86,504,000.00. AR 347; AR 389. Amendment 5 to the solicitation, issued on June 8, 2023, extended the period of performance to 1500 days. AR 1369; AR 1373. After increasing the period of performance, the Army Corps revised the IGE to $97,047,913.85 to reflect additional costs associated with the extended schedule and other costs not captured in the in the original estimate. AR 395.

The Army Corps explained the extension, stating that, under the original 1000-day period of performance, it anticipated receiving only one bid. It sought to preserve competition by extending the performance period. AR 1436. The Army Corps also relied on comments from Trumble and from the contractor performing phases 1 and 2 of the construction. AR 380; AR 383; AR 1437. Those comments expressed concerns that the 1000-day period was too short and requested that the agency extend it. *Id*. According to the Army Corps, increasing the period of performance "would provide the time needed to perform the work, taking into account all of the variables concerning weather and other delays." AR 1437.

B.   **The initial proposals and discussions**

The Army Corps received two proposals, one from Trumble and one from Pacific Tech. AR 1798. The Army Corps found that both proposals contained deficiencies that made them ineligible for the contract. *Id*. The Army Corps provided the following summary of the evaluations for the initial proposals.

| Offerors | Factor 1 | Factor 2 | Factor 3 | Factor 4 |
|---|---|---|---|---|
| Pacific Tech | Satisfactory Confidence | Good | Unacceptable | Unacceptable |
| Trumble | Neutral Confidence | Unacceptable | Unacceptable | Unacceptable |

*Id*.

Because neither proposal technically complied with the terms of the solicitation, the Army Corps decided that it was in the best interest of the government to conduct discussions with both offerors and to allow each offeror to submit a revised proposal. AR 1792; AR 1810. The Army Corps sent each offeror a discussion letter detailing its proposal's deficiencies and weaknesses. AR 1813-26.

The Army Corps's letter to Pacific Tech described three deficiencies: one for key management personnel, based on Pacific Tech's registered roofing observer's resume missing the required experience (AR 1815), and two for its small business approach, because Pacific Tech's proposal did "not demonstrate [its] planned level of commitment to small business (SB) usage under this solicitation or its previous commitment to SBs through its record of past SB utilization" (AR 1801; AR 1815).

The Army Corps assigned twelve deficiencies to Trumble's proposal. AR 1802-06. It assigned five deficiencies for its technical approach (factor 2): two associated with the schedule; one for "failing to understand the terms of the solicitation" in describing working directly with NASA instead of coordinating with the Army Corps on the project; and two associated with subcontractors on the project, including failing to provide a list of subcontractors Trumble intended to use for the project. AR 1802-04. On the subcontractors, Trumble's initial proposal stated that it would use "Key Subcontractors" for "Demolition, Abatement, Mechanical, HVAC / Plumbing and Electrical" work. AR 1674. Trumble's accompanying narrative did not include a list of the subcontractors that it intended to use for those tasks.

The Army Corps also assigned Trumble's proposal a significant weakness for vagueness in the construction schedule and lack of project phases, under factor 2, stating,

> The proposal's narrative discussing aspects of the technical approach was weak specifically when describing their preliminary schedule … . [Trumble] was to provide a preliminary construction schedule to demonstrate an understanding of the entire scope. The schedule provided did not demonstrate a critical path method, free float, or project phasing … . The durations of some scheduled activities such as material procurement, mobilization, and receipt of [a notice to proceed] appear insufficient and unreasonable. The narrative provided with the schedule is vague and does not demonstrate the logic for the schedule or [Trumble's] unique approach to logistics and site utilization to achieve the project schedule. The [evaluation board] determined the lack of clarity in the schedule to be a significant weakness in the proposal.

AR 1804.

The Army Corps also assigned Trumble's proposal five deficiencies for key management personnel (factor 3), for failing to demonstrate that its five managers had the necessary experience, as the solicitation required. AR 1787-90. It determined that Trumble's managers' resumes did not show enough relevant project experience. *Id*.

Finally, the Army Corps assigned Trumble's proposal two deficiencies for its small business approach (factor 4) for failing to "demonstrate [Trumble's] planned level of commitment to

5

small business (SB) usage under this solicitation or its previous commitments to SBs through tis record of past SB utilization." AR 1807.

The Army Corps's discussion letters to the parties detailed each deficiency and weakness, including specifics of what the Army Corps expected in a revised proposal to meet the terms of the solicitation. AR 1813-26 (explaining that a revised proposal would require a list of subcontractors, a more specific construction schedule with project phases, and more detail in the managers' resumes).

### C.     The revised proposals and selection

After the Army Corps's discussions with Trumble and Pacific Tech, both offerors submitted updated proposals, and the Army Corps evaluated the revised proposals. AR 2136. Both offerors resolved some issues, but the Army Corps still found Trumble's revised proposal to have both four deficiencies and a weakness, and the Army Corps rated Trumble's proposal as unacceptable under factors 2 and 3. *Id*.

With Pacific Tech providing the only awardable contract, the Army Corps chose to proceed with the evaluation and award of the contract to Pacific Tech, instead of continuing discussions with both offerors. AR 2348. The Army Corps explained each of Trumble's four deficiencies: one for failing to correct its list of subcontractors and not describing the subcontractors it intended to use for demolition and abatement, and three for still failing to provide the relevant details for the key management personnel, even though Trumble had replaced many of its earlier proposed managers with new proposed managers. AR 2342-44. The Army Corps also explained that Trumble's proposal still had a weakness due to flaws in its preliminary construction schedule. AR 2343. The Army Corps highlighted vague statements that concerned it because of Trumble's aggressive timeline, Trumble's failure to detail its project phases, and Trumble's failure to allocate enough time to procure materials. AR 2131.

Pacific Tech's revised proposal contained no weaknesses or deficiencies, and the Army Corps gave Pacific Tech a high rating for relevant past performance. AR 2349. After determining that Pacific Tech's proposal was technically awardable, the Army Corps evaluated Pacific Tech's price and found it "fair and reasonable" based on a "comparison of proposed prices with independent Government cost estimates, comparison of proposed prices received in response to the solicitation, and comparison of the proposed prices to historical prices paid." AR 2344. The Army Corps noted that while Pacific Tech's proposed price was higher than Trumble's, Pacific Tech had a high technical rating and was reasonable when compared to the IGE and historical prices. AR 2344-49.

### D.     The debriefing

After the Army Corps notified Trumble of Pacific Tech's award, Trumble submitted debriefing questions. AR 3073. Trumble's questions (1) challenged the "deficient rating due [to] the absence of a list of subcontractors" and explained that Trumble intended to do the tasks itself; (2) challenged the weakness based on project phases; and (3) expressed concern over the disqualification of Trumble's key management personnel and explained that the disqualified managers had the required experience. AR 3073-74.

6

The Army Corps responded. AR 3073-78. The Army Corps explained that the solicitation required Trumble to "provide a list of subcontractors," and that Trumble did not provide subcontractors for demolition and abatement, nor did Trumble explain in its proposal, or any time before the contract award, that it intended to do those tasks itself. AR 3077. For the schedule, the Army Corps explained that Trumble's proposal did not include the project phases that were requested in the discussion letter. AR 3077. For key management personnel, the Army Corps explained that the solicitation provided an example of how resumes should demonstrate project experience, that it had notified Trumble of the requirements in the discussion letter and provided an opportunity for Trumble to correct its original submissions, and that Trumble had failed to provide that information. AR 3077-79.

Following the debriefing, Trumble contacted Pacific Tech, asking to work on part of the contract as a subcontractor. ECF No. 27-1 at 2 [¶8]. After several months of negotiations, Pacific Tech told Trumble that it would not hire Trumble as a subcontractor for the project. *Id*. at 5-6 [¶18]. Trumble then filed this protest. *Id*. at 6 [¶18].

## II. Discussion

### A. Legal standards

This court's jurisdiction is primarily defined by the Tucker Act, which provides the court with exclusive jurisdiction to decide specific types of monetary claims against the United States. *Kanemoto v. Reno*, 41 F.3d 641, 644 (Fed. Cir. 1994); 28 U.S.C. § 1491(a)(1). The Tucker Act provides the court with "jurisdiction to render judgment upon any claim against the United States founded … upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

The Tucker Act's grant of jurisdiction extends to bid protest actions. 28 U.S.C. § 1491(b)(1). The court has "jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded." *Id*. "In any action under the [bid protest subsection], the courts shall review the agency's decision pursuant to the standard set forth in section 706 of [the Administrative Procedure Act]." 28 U.S.C. § 1491(b)(4). Section 706 directs the reviewing court to set aside agency action that it finds to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] ... (E) unsupported by substantial evidence in a case subject to sections 556 and 557 ... or otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2); *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

The Supreme Court has explained that "[r]eview under the substantial-evidence test is authorized only when the agency action is taken pursuant to a rulemaking provision of the Administrative Procedure Act itself or when the agency action is based on a public adjudicatory hearing." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971) (internal citations omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The Federal Circuit has explained that because bid protests are undertaken in the "absence of [an agency] hearing," the "'substantial evidence' standard does not apply." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Camp v. Pitts*, 411 U.S. 138, 141 (1973)); *see Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1377 (Fed. Cir. 2022) (explaining that in reviewing this

7

court's review of a bid protest, the Federal Circuit "reapplies the 'arbitrary and capricious' standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), to the agency's decision" (citations omitted)).

According to the Federal Circuit, the "arbitrary and capricious" standard in bid protest actions requires this court to first determine whether "either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).[2] The court upholds an agency's decision if the court determines that the agency "provided a coherent and reasonable explanation of its exercise of discretion." *Id*. at 1333; *see Advanced Data*, 216 F.3d at 1058.[3]

The protester "bears a 'heavy burden' of showing that the award decision had no rational basis." *Impresa*, 238 F.3d at 1333 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)). The court will uphold the agency's action unless the protester can show that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or issued a decision that is so implausible that the decision could not be ascribed to a difference in view or the product of agency expertise." *Tinton Falls*, 800 F.3d at 1358 (citations omitted). "[A]n offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably." *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 717-

---

[2] The Federal Circuit uses the term "rational basis," which the court understands as assessing whether the agency acted rationally or reasonably in making its decision. *See generally Impresa*, 238 F.3d at 1332. That is distinct from the "rational basis" test that courts apply to certain constitutional questions, *e.g.*, *Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012), so to avoid confusion the court here will apply the same standard of review but will describe it in terms of whether the agency acted rationally or reasonably.

[3] Some judges on this court have taken a different approach, requiring that protesters demonstrate that the agency acted arbitrarily or capriciously by a "preponderance of the evidence." *E.g.*, *Thalle / Nicholson Joint Venture v. United States*, 164 Fed. Cl. 224, 231 (2023); *Mortgage Contracting Services, LLC v. United States*, 153 Fed. Cl. 89, 124 (2021); *GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 779 (1997). That approach does not seem to comport with the Administrative Procedure Act's or the Federal Circuit's standard and may be importing the standard to establish standing in reviewing a bid protest, a question this court addresses in the first instance because agencies do not have traditional Article III standing requirements. *See Thalle / Nicholson*, 164 Fed. Cl. at 231; *see generally Momenta Pharms., Inc. v. Bristol-Myers Squibb Co.*, 915 F.3d 764, 768 (Fed. Cir. 2019) ("[T]he 'case' and 'controversy' restrictions for standing do not apply to matters before administrative agencies and boards." (citations omitted)). For example, this court's decision in *Mortgage Contracting*, which other decisions from this court rely on, cites the dissent in *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353 (Fed. Cir. 2015). *Mortgage Contracting*, 153 Fed. Cl. at 124. The *Tinton Falls* dissent focuses on the failure to establish standing by a preponderance of the evidence; it does not apply the preponderance-of-the-evidence standard to bid protest cases more broadly. 800 F.3d at 1366 ("Because the record is void of preponderant evidence establishing this jurisdictional requirement, I respectfully dissent.").

8

18 (2011), *aff'd*, 475 F. App'x 341 (Fed. Cir. 2012). "In a best value procurement, agencies have even greater discretion to determine the proper award than if the contract was awarded upon the basis of cost alone." *Galen Medical Assocs., Inc. v. United* States, 369 F.3d 1324, 1329-30 (Fed. Cir. 2004).

The court does not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 at 43 (1983). "Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). This standard is "highly deferential." *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). But "it is not a rubber stamp." *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 742 (2000). It is not enough for the court to find an error; the protester "must show a significant, prejudicial error in the procurement process." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999). To show prejudice, the protester must show "that there was a substantial chance it would have received the contract award but for [the agency's] error." *Id.* (quotation marks and citation omitted).

A party may move for judgment on the administrative record, asking the court to determine "whether the administrative body, given all disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review" under rule 52.1 of the Rules of the Court of Federal Claims. *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013). The parties are limited to the administrative record, and the court makes any factual findings as if it were conducting a trial on the record. *Bannum, Inc.*, 404 F.3d at 1357. The court then determines "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006).

### B. The Army Corps reasonably assessed the proposals and determined that Trumble's proposal was not eligible for an award under the solicitation

Under the terms of the solicitation, only offerors whose proposals did not have any deficiencies were eligible for the contract. AR 374. The Army Corps's assignment of four deficiencies to Trumble's revised proposal, each of which alone made Trumble's proposal not awardable, is supported by the record; the Army Corps communicated those deficiencies to Trumble with an opportunity for Trumble to correct them; Trumble did not correct them; and Trumble has not met its burden to demonstrate that the Army Corps acted arbitrarily or capriciously. The court therefore finds that the Army Corps acted rationally in determining that Trumble's proposal was not awardable under the terms of the solicitation.

#### 1. The Army Corps reasonably assigned three deficiencies against Trumble for failing to show that its managers had enough experience, communicated those deficiencies to Trumble, and had no obligation to engage in further discussions

Under factor 3 of the solicitation, key management personnel, offerors had to include resumes that showed the relevant experience of five key managers. AR 360-61. The solicitation also included a form each offeror could fill out for each manager and examples of the types of

descriptions that would satisfy the solicitation's requirements. AR 369. The Army Corps determined that none of the resumes Trumble submitted in its initial proposal satisfied the requirements of the solicitation, so it assigned Trumble five deficiencies. AR 1822-24. The Army Corps engaged in a round of discussions with Trumble and sent a letter to Trumble noting each specific deficiency. AR 1810; AR 1818. The Army Corps offered Trumble an opportunity to revise its proposal to correct the deficiencies. AR 1818. Trumble submitted a revised proposal, replacing several of its managers. AR 1989-2003. The Army Corps evaluated Trumble's revised proposal and determined that Trumble had corrected two of the deficiencies, but it found that three remained, each of which alone made Trumble's proposal ineligible for the contract. AR 2343-44. The remaining three deficiencies were, again, for insufficient detail in the new proposed managers' resumes. AR 2134-35.

The record demonstrates that the Army Corps acted reasonably in evaluating the resumes submitted by Trumble. The solicitation was clear about what information offerors needed to provide in managers' resumes. AR 444-45; AR 453. The solicitation gave notice to each offeror that any resume that did not meet the requirements would result in an "unacceptable" rating, making the proposal ineligible for the contract. AR 457.

The Army Corps explained why it rejected each resume. AR 2134-35. For the superintendent role, the Army Corps explained that Mr. Lowe's resume lacked enough detail for the Army Corps to determine if he had ever served as an on-site superintendent that "managed multiple trades and subcontractors." AR 2134. The Army Corps also explained that Mr. Lowe's resume lacked sufficient detail to assess whether his experience met the minimum years of experience. AR 2343-44. Similarly, the Army Corps explained that the resumes for the contractor quality control manager and registered roofing observer were too sparse to show the required levels of experience. AR 2344.

Trumble argues that the individuals it proposed were qualified for the manager roles. Trumble argues that the agency acted irrationally by not seeking clarifications or engaging in additional discussions with Trumble to get the information that would have shown that its managers met the required qualifications. ECF No. 22 at 22-27. According to Trumble, the Army Corps had an obligation to engage in discussions because Trumble's bid was significantly less costly than Pacific Tech's. *Id*. (citing *Level 3 Communications, LLC v. United States*, 129 Fed. Cl. 487, 504 (2016)).

As the protester, Trumble bears the burden to demonstrate that the actions and decisions of the agency were arbitrary or capricious. *Tinton Falls*, 800 F.3d at 1358. Here, there is an undisputed record in which the Army Corps documented its decisionmaking, provided guidance to the parties for any deficiencies and weaknesses, and applied the terms of the solicitation in evaluating Trumble's proposal.

Although Trumble argues that it would have been eligible for the contract if the Army Corps had engaged in further discussions or clarifications with Trumble, the Army Corps appropriately exercised its discretion to not engage with Trumble further. *JWK Int'l Corp. v. United States*, 279 F.3d 985, 988 (Fed. Cir. 2002) (citing 48 C.F.R. § 15.306(d)(3)); *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 510 (2013). "[T]he number of rounds of discussions to be held with offerors is largely a matter of the procuring agency's discretion." *iAccess Techs., Inc. v. United States*, 143 Fed. Cl. 521, 538 (2019).

Here the solicitation stated that the Army Corps would provide offerors the opportunity to make limited clarifications to their proposals but did not intend, at the outset, to hold discussions that would allow for more significant changes to the proposals. The solicitation stated that offerors would have a chance to "clarify certain aspects of the proposals or to resolve minor clerical errors" without "revis[ing] or modify[ing]" the proposals. AR 458. It further stated that "[t]he government intends to make a determination of contract award based on initial proposals without holding discussions" and that "[o]fferors are cautioned that discussions may not be conducted and offerors should not assume that they will have an opportunity to revise their proposals after submission." AR 375. The solicitation further explained that, if the Army Corps later determined that it was in the government's best interest, the Army Corps might hold discussions, which unlike clarifications, would provide an offeror the opportunity to address deficiencies and weaknesses in a revised proposal. AR 459. The solicitation warned offerors that a failure to remedy deficiencies that the Army Corps raised in any discussions would preclude awarding the contract to that offeror. AR 458.

The agency decided to engage in one round of discussions after it found the two proposals ineligible for the contract. After evaluating the revised proposals and determining that one of the proposals was eligible, the Army Corps had no obligation to engage in further discussions. *E.g.*, *Allicent Tech., LLC v. United States*, 166 Fed. Cl. 77, 142 (2023), *as amended* (July 18, 2023), *reconsideration denied*, No. 22-1380C, 2023 WL 4287196 (Fed. Cl. June 30, 2023) (explaining that it is in the contracting officer's discretion to hold discussions and only "extraordinary factual circumstances" would warrant overturning an agency's decision not to hold discussions); *DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 539 (2007) (explaining that an agency is not precluded from awarding a contract "merely because an unacceptable lower offer could be made acceptable through discussions"); *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 847 (1999) (An agency has no "obligation to reopen discussions with [an offeror] to allow it the opportunity to cure deficiencies that had not been corrected" following a first round of discussions.); *Dolphin Park TT, LLC v. United States*, 162 Fed. Cl. 248, 270 (2022) ("[T]he government is not obligated to re-discuss items which a bidder has already had an opportunity to respond, or to spoon-feed an offeror as to each and every item that must be revised, added, or otherwise addressed to improve a proposal." (marks omitted)).

Trumble relies on *BCPeabody* to argue that an agency may abuse its discretion if it does not seek clarifications when there is a large price different between offerors. ECF No 22 at 23. *BCPeabody* involved a lowest priced, technically acceptable procurement. 112 Fed. Cl. at 506, 513. This case involves a best value procurement where the agency made clear from the outset that price was not the most important factor. The law is clear that the contracting officer has broad discretion to make determinations regarding the contract, and that discretion is even broader for best value contracts like the one at issue here. *Galen Medical*, 369 F.3d at 1329-30.

Moreover, in *BCPeabody*, the contracting officer knew that one bidder's proposal contained a simple copying error that could have been resolved through a clarification. 112 Fed. Cl. at 508-10. Likewise, in *Aspire Therapy Services & Consultants, Inc. v. United States*, another case that Trumble cites, the proposal contained an "obvious typographical mistake" that was easily reconcilable through a clarification. 166 Fed. Cl. 366, 379 (2023). Here, there is no evidence that the Army Corps knew or should have known that Trumble might have been able to resolve the deficiencies in its proposal. In fact, Trumble cites nothing, other than its own comments after the

contract was awarded, to suggest that the managers Trumble proposed to use had the experience required by the solicitation. *See* AR 3073-74.

The analysis does not change because Trumble replaced its key management personnel after receiving the initial evaluation, and the Army Corps then assigned deficiencies to the new proposed managers. "Deficiencies or weaknesses that appear for the first time in a revised proposal during discussions do not oblige the agency to extend discussions further with that offeror." *iAccess*, 143 Fed. Cl. at 538; *see E. Shipbuilding Grp., Inc. v. United States*, 168 Fed. Cl. 559, 586 (2023) (holding that "there is no requirement that an agency reopen discussions on issues that arise, as they do here, out of changes made in [a revised proposal] after discussions have ended"); *Iron Bow Techs., LLC v. United States*, 133 Fed. Cl. 764, 779 & n.11 (2017) (adopting the GAO's standard that "in a post-discussion proposal revision, an agency has no duty to reopen discussions or conduct additional rounds of discussions," quoting *Matter of Raytheon Con.*, B–403110.3, 2011 WL 1894853 (Apr. 26, 2011)). That is especially true where the deficiency in the new proposal is the same type of deficiency that received the feedback earlier—here, a failure to show that the managers had enough experience. *Compare* AR 2131-34 (Trumble's managers' deficiencies in its first proposal) *with* AR 2134-35 (Trumble's managers' deficiencies in its revised proposal).

The Army Corps had no obligation to continue discussions with Trumble regarding whether its key management personnel met the requirements of the solicitation.

### 2. The Army Corps reasonably assigned a deficiency against Trumble's proposal for failing to provide a complete list of subcontractors

Trumble argues that the Army Corps unreasonably assigned Trumble a deficiency under factor 2, planned technical approach, for failing to provide a full list of subcontractors, including for demolition and abatement. ECF No. 22 at 25, 31-32. According to Trumble, it did not list a subcontractor for those tasks because it intended to perform those tasks itself. AR 3077. Trumble argues that under the plain language of the solicitation, offerors were only required to submit a list of subcontractors they intended to use on the project, and Trumble had no obligation to tell the Army Corps which tasks it intended to perform itself. ECF No. 33 at 19.

The Army Corps did not act arbitrarily or capriciously in assigning Trumble's proposal a deficiency under factor 2. The solicitation required "a list of subcontractors intended to be used for the project." AR 443-44. Trumble does not dispute that its original proposal contained no such list. Both Trumble's original proposal (AR 1674) and its revised proposal (AR 2062) included the same statement: Trumble "will get input from the Key Subcontractors—Demolition, Abatement, Mechanical, HVAC / Plumbing and Electrical during the preconstruction phase." The Army Corps reasonably interpreted that statement to mean that Trumble was listing the tasks it intended to hire subcontractors for. AR 1821. Trumble did not state that it would self-perform any of the tasks for which it said it would have "Key Subcontractor" input. *See generally* AR 1568-765. The Army Corps assigned Trumble's initial proposal a deficiency for failing to provide a list of subcontractors. AR 1821. The Army Corps gave Trumble an opportunity to fix the deficiency, stating, "the narrative was to provide a list of subcontractors intended to be used for the project. The narrative demonstrates [Trumble's] intention to select qualified subcontractors but does not include a list of subcontractors intended to be used for the project." *Id*.

After that warning, Trumble's revised proposal still provided no list of subcontractors and did not indicate that it intended to perform demolition and abatement itself. *See* AR 2008-115. The Army Corps even looked at Trumble's small-business-approach narrative to see if Trumble had listed subcontractors in a different section. AR 2342. The Army Corps determined that Trumble had provided a list of some of its "key subcontractors" in the factor 4 narrative, and gave Trumble credit for those subcontractors, despite Trumble's not following the precise terms of the solicitation. *Id*. But Trumble did not list a subcontractor for demolition and abatement in any section of its proposal. AR 2342.

Trumble bears the burden of showing that the agency acted arbitrarily and capriciously in its decisionmaking. *Tinton Falls*, 800 F.3d at 1358. Trumble has not met that burden. In its motion for judgment on the administrative record, Trumble does not address the statements in its proposal about getting input from key subcontractors. Instead, Trumble argues that it notified the Army Corps that "the Company was self-performing demolition and abatement, therefore there was no subcontractor to be listed." ECF No. 22 at 25, 32 (citing AR 3077). The only record evidence Trumble relies on for that statement came in a debriefing email after the contract had already been awarded to Pacific Tech. AR 3073. Post-decision comments by Trumble are irrelevant to the agency's up-front decisionmaking. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (explaining that judicial review of agency action is generally limited to the record before the agency).[4]

Furthermore, "the obviousness of the error is an important aspect of determining whether the [contracting officer] acted reasonably by not seeking clarification." *Criterion Sys., Inc. v. United States*, 140 Fed. Cl. 29, 37 (Fed. Cl. 2018). The agency had no way of knowing that Trumble did not, in fact, plan to get input from key subcontractors on the demolition and abatement.

Trumble's proposal did not meet the terms of the solicitation. "[A] proposal that fails to conform to the material terms and conditions of [a] solicitation should be considered unacceptable, and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *Allied Tech. Grp. v. United States*, 649 F.3d 1320, 1329 (Fed. Cir. 2011). The Army Corps notified Trumble of the deficiency and gave it an opportunity to correct its proposal. AR 1821. Trumble had the obligation to provide a proposal that was "complete, understandable, and provide[d] sufficient support" that it met the terms of the solicitation. *Iron Bow Techs., LLC v. United States*,132 Fed. Cl. 346, 357 (2017).

The Army Corps's assessment of a deficiency under factor 2 of the solicitation was supported by the record and was not arbitrary or capricious.

---

[4] The parties argue about the relevance of other materials that post-date the Army Corps's decision. *See* ECF No 22 at 17-18, 27; ECF No. 27 at 20-21, 26, 40; ECF No. 28 at 48 n.3. This decision does not rely on those materials, which were likewise not the basis of the agency's decisionmaking.

### 3. The Army Corps reasonably assigned Trumble a weakness for failing to provide a construction schedule with the details requested by the solicitation

In addition to assigning Trumble's proposal four deficiencies, any of which would have been sufficient to deny Trumble the contract, the Army Corps reasonably assigned Trumble's revised proposal a weakness for having a schedule that was vague and did not adequately break the project up into phases. AR 2131; AR 2343. The solicitation required offerors to provide a construction schedule that "contain[ed] a narrative explaining the logic and durations for the schedule" with "the Offeror's unique approach to logistics and site utilization" and "demonstrat[ed] the Offeror's overall understanding of the requirements of the contract." AR 120. According to the solicitation, a critical element of the schedule was project phasing so that NASA could "maintain its normal schedul[e] and operation." AR 1355. The solicitation thus required, "at a minimum, the procedures to be employed, the equipment and materials to be used, the interim life safety measure to be used during the work, system outage requests and a schedule defining the duration of the work with milestone subtasks." *Id*.

Trumble does not dispute that the Army Corps reasonably assigned a weakness to its revised proposal, instead arguing that the "lack of clarity in Trumble's schedule could easily be addressed through a Clarification or continued Discussions." ECF No. 22 at 24 n.10. As with the deficiencies assigned to Trumble, the Army Corps had no obligation to continue discussions with offerors.[5] The Army Corps assigned Trumble's original proposal a "significant weakness" because the preliminary schedule lacked details that the solicitation requested. AR 1822. The Army Corps told Trumble about that weakness, told it which specific areas lacked detail, and gave it an opportunity to revise its proposal. AR 1818-26. After the revision, the Army Corps still found that Trumble's solicitation had a weakness in its preliminary schedule, and many of the same areas that lacked detail in the original schedule had not been improved in the revised schedule. AR 2130-31. The record supports the Army Corps's assessment of a weakness.

### 4. The Army Corps's decision to change to the period of performance was supported by the record

The Army Corps amended the solicitation to increase the performance period from 1000 days to 1500 days. *See generally* AR 1189-433. According to Trumble, the Army Corps extended the period of performance only because it was trying to avoid an audit by the Defense Contract Audit Agency (DCAA), not because it thought the project should take extra time. ECF No. 22 at

---

[5] Trumble equates clarifications, which "clarify certain aspects of the proposals or to resolve minor or clerical errors" and do "not give the offeror an opportunity to revise or modify its proposal" (AR 374), with discussions, which allow for revisions to resolve identified weaknesses and deficiencies (AR 375). Addressing the weakness in Trumble's proposal would require either rewriting or adding to the scheduling narrative in Trumble's proposal. *See, e.g.*, AR 2131; AR 2343; AR 2348. Trumble could have addressed that weakness only through continued discussions and not clarifications. *See, e.g., Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998. (Fed. Cir. 2018); *ENGlobal Gov't Servs., Inc. v. United States*, 159 Fed. Cl. 744, 766 (2022) ("Where a proposal has been substantively revised or modified, discussions have occurred.").

20 n.6, 21. According to Trumble, that one decision tainted the Army Corps's evaluation of offers, resulting in the agency's selecting an overpriced offer. Trumble adds that the Army Corps then improperly held the change in period of performance against Trumble.[6]

Trumble's allegation that the Army Corps extended the period of performance only to avoid a DCAA audit ignores the multiple stated reasons for the change. Before the amendment, the Army Corps discussed the need to extend the performance period to maintain competition because contractors, including Trumble (AR 382), had said that it would be difficult to complete the work in 1000 days. There is nothing arbitrary about changing the performance period based on feedback that the solicitation's performance period was infeasible. And Trumble itself cannot complain when it was the one requesting that change. *See generally Davis v. Wakelee*, 156 U.S. 680, 689 (1895) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the [earlier] position.").

The Army Corps was also concerned that it might receive only one offer, which would result in a DCAA audit that could take up to 6 months. AR 1436. The Army Corps's desire to avoid a DCAA audit likewise stemmed from its interest in having a competitive bidding process. *Id.* Maintaining competition is a legitimate reason—neither arbitrary nor capricious—for the government to amend the terms of a solicitation. *ManTech Telecommunications & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 73 (2001), *aff'd*, 30 F. App'x 995 (Fed. Cir. 2002) ("[T]he contracting agency has broad discretion to amend the solicitation when it determines that such action is necessary to ensure fair and impartial competition and to permit the government to obtain its minimum requirements at the most favorable price."); *Pro. Serv. Indus., Inc. v. United States*, 129 Fed. Cl. 190, 206 (2016) ("[T]he agency's decision to amend the solicitation is entitled to a presumption of regularity.").

Furthermore, the Army Corps did not hold the 1500-day timeline against Trumble's proposal, so any error in making that change would be harmless. As discussed (part II.B.3), the Army Corps expressed concern that it did not have enough information to evaluate Trumble's vague yet aggressive timeline. The Army Corps evaluated all potential offers under the same criteria; the Army Corps did not penalize anyone for not using the full 1500 days. The Army Corps looked at whether it thought the proposed schedules were thorough enough to trust that they were feasible.

---

[6] The government and Pacific Tech argue that Trumble's challenge to the change in the period of performance is untimely because Trumble should have brought the challenge pre-award. They argue that Trumble is belatedly challenging the terms of the solicitation, and Trumble forfeited that challenge under *Blue & Gold*. ECF No. 27 at 38-39; ECF No. 28 at 29-30; *see Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action."). Trumble responds that it is actually challenging the "arbitrary basis for the Agency decision," and that it only learned that basis after the Army Corps awarded the contract. ECF No. 33 at 13. While Trumble likely forfeited its challenge to the period of performance, the agency acted rationally in making the change, so the court need not resolve the forfeiture issue.

15

*See* AR 2120-37. Trumble has not shown that it suffered prejudice from the increase in the period of performance. *Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 534 (2013).

Regardless, none of the deficiencies that the Army Corps found in Trumble's proposal depended on its timeline. Each of those deficiencies independently made Trumble ineligible for the contract.

### C. The Army Corps reasonably determined that the price of Pacific Tech's proposal was fair and reasonable

"Contracting officers must procure services 'at fair and reasonable prices.'" *DynCorp*, 10 F.4th at 1310 (quoting Federal Acquisition Regulation (FAR) 15.402(a)). Trumble argues that Pacific Tech's proposal was not eligible for the contract because it was not fairly and reasonably priced. ECF No. 22 at 29-30. According to Trumble, the Army Corps's price analysis suffers from two key flaws: (1) the independent government estimate was artificially inflated based on the assumption that the work would take an additional 500 days; and (2) the Army Corps should have compared Pacific Tech's price with Trumble's and determined that Pacific Tech's price was unreasonable because it was significantly higher. *Id.*

As discussed above, the Army Corps's decision to extend the performance period was supported by the record. A longer period of performance logically implies a higher price. *See* AR 2269-70. Thus, there was nothing arbitrary or capricious about the corresponding increase in the independent government estimate.

Regarding Trumble's price, as the Army Corps explained, because Trumble's bid did not meet the government requirements and was not awardable, the Army Corps could not determine whether Trumble's price was reasonable or unreasonable. AR 2345-47; AR 2271. The Army Corps highlighted Trumble's proposal's lack of evident manager experience and questioned the 1000-day assumption in Trumble's proposal, given Trumble's own concern about meeting the 1000-day schedule. *See, e.g.*, AR 2273 ("[Trumble's] schedule was assessed a Weakness for not including phasing and other key facets, which may have artificially reduced their overall completion dates."); AR 2346 ("The proposed 1000-day performance period is unrealistic in light of the lack of adequate planning for procurement and phasing."); AR 2348 ("[Trumble's] revised proposal … [is] not sufficient to demonstrate an understanding of the overall duration of the project and construction activities that are necessary in order to meet the requirements of the project."). The Army Corps also extrapolated the cost of phases 1 and 2 to phases 3 and 4, noting that that estimate was 29.5 percent higher than Trumble's proposal, "present[ing] significant cost risk" (risk of going over budget), especially because the Army Corps anticipated that phases 3 and 4 would be more complex than phases 1 and 2. AR 2346-47.

"[I]f the contracting officer determines that information on competitive proposed prices … is not available or is insufficient to determine that the price is fair and reasonable, the contracting officer may use any of the remaining techniques as appropriate." *DynCorp*, 10 F.4th at 1314 (also explaining that the requirements of FAR 15.404-1(b)(3) "are not particularly demanding"). Because the Army Corps did not have a price from Trumble that it could compare to Pacific Tech's price for reasonableness, the Army Corps compared Pacific Tech's price to the IGE and the extrapolated price of phases 1 and 2. AR 2344-49. The Army Corps determined that Pacific Tech's

proposal was 11.6 percent higher than the IGE (AR 2345) and that ▓ accounted for more than half the difference (*id*.). The Army Corps found that "it is reasonable to expect differences ▓ considering the contractors['] unique approach that the ▓ may be different from the Government estimators" and noted that Pacific Tech's ▓ would be the onsite project manager. AR 2272. The Army Corps determined that Pacific Tech's proposal was 16 percent higher than the historical price—extrapolated from phases 1 and 2—and that this was a reasonable price difference because phases 3 and 4 were more complex. AR 2346-47. The Army Corps concluded that "the strength under the technical approach and superior confidence ratings due to past performance of Pacific Tech Construction, Inc., represent a value to the Government worth the price premium represented by the proposal compared to the IGE." AR 2349.

The contracting officer has broad discretion in conducting a "proposal price-reasonableness analysis." *DynCorp*, 10 F.4th at 1311. In evaluating Pacific Tech's proposal, the Army Corps compared the proposal to the IGE and to historical prices. AR 2344. The Army Corps reasonably determined that Pacific Tech's proposal was priced fairly and reasonably.

### D. Injunctive relief is not appropriate because Trumble has not prevailed on the merits

Trumble requests that the court permanently enjoin performance of the contract awarded to Pacific Tech. ECF No. 22 at 36. Trumble also requests that the court require the Army Corps to perform a new evaluation and make a new best value award decision. *Id*. Achieving success on the merits "is a necessary element for a permanent injunction." *Dell Fed. Sys.*, 906 F.3d at 999. In this case, Trumble has not succeeded on the merits, so Trumble is not entitled to a permanent injunction.

### III. Conclusion

The government's motion for judgment on the administrative record is **granted**, Pacific Tech's motion for judgment on the administrative record is **granted**, and Trumble's motion for judgment on the administrative record is **denied**. The Clerk of the Court shall enter judgment.

**IT IS SO ORDERED.**

    s/ Molly R. Silfen
MOLLY R. SILFEN
Judge